## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 16 2017, 6:29 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Darlene R. Seymour
Ciyou & Dixon, P.C.
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

David E. Baum
David E. Baum Law Office, P.C.
Chesterton, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In Re: The Marriage of S.B., <br><br> *Appellant-Petitioner,* <br><br> v. <br><br> J.B., <br><br> *Appellee-Respondent* | November 16, 2017 <br><br> Court of Appeals Case No. 64A03-1706-DR-1185 <br><br> Appeal from the Porter Superior Court <br><br> The Honorable Roger V. Bradford, Judge <br> The Honorable Mary A. DeBoer, Magistrate <br><br> Trial Court Cause No. 64D01-1303-DR-2181 |

**Baker, Judge.**

This is the second time this Court has had occasion to consider the contentious custody arrangement between S.B. (Mother) and J.B. (Father). After the first appeal, we remanded to the trial court with instructions to engage in required statutory analysis. It did so and arrived at the same result, awarding physical custody of the parties' child to Father and denying Mother's request to relocate with the child. Mother now appeals, arguing that the trial court did not comply with our directive and that the evidence does not support its order. Finding that the trial court adeptly complied with our instructions and that the evidence is sufficient, we affirm.

## Facts

The underlying facts, as described by this Court in the first appeal involving these parties, are as follows:

> Mother and Father were married, and one child, B.B., was born of the marriage on May 27, 2010. Their marriage was dissolved on August 7, 2014. As part of its dissolution order, the dissolution court incorporated an agreement reached during mediation by the parties regarding custody and parenting time (the Mediation Agreement). In relevant part, the Mediation Agreement provides as follows:
>
> - Mother and Father would have joint legal custody of B.B.
> - Although the Mediation Agreement does not include a specific agreement regarding physical custody of B.B., it implied that B.B. would live with Mother and stated that Father would have parenting time every other weekend and one weeknight per week. Father also provided childcare to B.B. during Mother's weekday work hours.

- Father agreed to pay child support based upon an assumption that he would exercise 140 overnights with B.B. annually.
- The Indiana Parenting Time Guidelines would govern division of holiday parenting time, and "Mother shall be classified as the custodial parent for the purpose of interpreting said guidelines, and for that purpose only." Appellant's App. p. 35.
- The parties agreed that the "parenting time schedule shall remain in effect through the date the parties' minor child commences kindergarten at which time the parties shall restructure parenting time to effectuate an equal division of the same based on the child's school schedule." *Id.*

In September 2014, Mother began searching for a more affordable home. She found a suitable option in North Judson, where Mother's parents lived, which was approximately twenty-five miles from her prior residence.

In December 2014, Father made a feces shape out of Play-Doh, placed it so that it appeared to be coming out of B.B.'s bottom, took a picture of the event, and posted it to Facebook. Mother saw the picture, became alarmed, and contacted the Department of Child Services (DCS). She refused to permit Father to exercise his parenting time until DCS completed its investigation and report. [Footnote 1] On December 19, 2014, Father filed pleadings with the court regarding the denial of his parenting time. The trial court issued a temporary restraining order requiring Mother to provide Father with his parenting time and a citation for contempt of court the same day.

[Footnote 1] DCS found that the allegations of abuse or neglect were unsubstantiated and no criminal charges were filed against Father as a result of the incident.

On January 7, 2015, Mother filed a notice of intent to relocate and a petition to modify parenting time based on the Play-Doh

incident. On February 23, 2015, Father filed a motion for an order to prevent the relocation of B.B. and a petition to modify custody, parenting time, and child support.

*In re the Marriage of S.B.*, No. 64A03-1603-DR-533, at *1-*2 (Ind. Ct. App. Dec. 20, 2016) ("*S.B. I*"), *trans. denied*. Following an evidentiary hearing, the trial court awarded physical custody to Father. Mother appealed and we reversed and remanded, finding that the trial court had not applied required statutory factors. On remand, we directed the trial court to (1) apply the burden-shifting provision found in Indiana Code section 31-17-2.2-5 to Father's motion to prevent B.B.'s relocation; and (2) apply and analyze all factors found in Indiana Code section 31-17-2.2-1(b) with respect to Father's motion to modify custody and parenting time. *Id.* at *5-*6.

[3] Following this Court's remand to the trial court, on May 5, 2017, the trial court issued a new order. After engaging in a lengthy analysis and addressing all required factors, the trial court ended up in the same place—it ordered that B.B. is not to relocate with Mother, that Father is to have sole physical custody of B.B., and that the parents will continue to share joint legal custody. Mother now appeals.

## Discussion and Decision

[4] Mother argues that the trial court's order did not comply with this Court's directive in the first appeal. She also appears to argue that even if the trial court's findings are compliant, the evidence does not support the trial court's conclusions. In reviewing the trial court's order, we first determine whether the

evidence supports the findings; and second, whether the findings support the judgment. *Harris v. Harris*, 800 N.E.2d 930, 934-35 (Ind. Ct. App. 2003). But we owe no deference to the trial court's conclusions of law and will review those conclusions de novo. *Id.* at 935. We will reverse only if the trial court's order is clearly erroneous. *Id.*

[5] As we explained in the first appeal:

> If a parent intends to relocate, she must file a notice of her intent to move with the court that issued the custody or parenting time order already in place. Ind. Code § 31-17-2.2-1(a). In response, the non-relocating parent may file a motion seeking a temporary or permanent order to prevent the relocation of the child. I.C. § 31-17-2.2-5. In many cases, one or both parents will also file a petition to modify custody and/or parenting time as a result of the relocation. In ruling on a petition to modify in the context of a relocating parent, the trial court "*shall*" take the following factors into consideration:
>
> > (1)  The distance involved in the proposed change of residence.
> >
> > (2)  The hardship and expense involved for the nonrelocating individual to exercise parenting time or grandparent visitation.
> >
> > (3)  The feasibility of preserving the relationship between the nonrelocating individual and the child through suitable parenting time and grandparent visitation arrangements, including consideration of the financial circumstances of the parties.

(4)     Whether there is an established pattern of conduct by the relocating individual, including actions by the relocating individual to either promote or thwart a nonrelocating individual's contact with the child.

(5)     The reasons provided by the:

    (A)     relocating individual for seeking relocation; and

    (B)     nonrelocating parent for opposing the relocation of the child.

(6)     Other factors affecting the best interest of the child.

I.C. § 31-17-2.2-1(b) (emphasis added). . . . [There is also] a statutory burden-shifting analysis required when a motion seeking an order to prevent the relocation of a child is filed:

(c)     The relocating individual has the burden of proof that the proposed relocation is made in good faith and for a legitimate reason.

(d)     If the relocating individual meets the burden of proof under subsection (c), the burden shifts to the nonrelocating parent to show that the proposed relocation is not in the best interest of the child.

I.C. § 3-17-2.2-5.[1]

*S.B. I*, at \*3-\*4.

[6] First, the trial court considered the distance involved in the proposed change of residence. It found that before Mother's relocation, she and Father lived approximately twenty minutes away from each other; afterwards, they lived approximately forty-five minutes away from each other. The evidence supports this finding, and we also note that Mother works, Father lives and works, and B.B. goes to school, in Valparaiso, which is forty-five minutes away from Mother's new residence in North Judson.

[7] Second, the trial court considered the hardship and expense involved for Father to exercise parenting time if relocation occurred. The trial court found as follows:

a. Prior to Mother's relocation to North Judson, Indiana, Father had very little to no hardship or expense to exercise parenting time with [B.B.] Because the parties lived in such close proximity to each other before Mother moved, picking up and dropping off [B.B.] for parenting time was

---

[1] With respect to the burden-shifting analysis, the trial court found before the first appeal that Mother established that her proposed relocation was made in good faith and for a legitimate reason. We directed the trial court to conduct the second step of the analysis, meaning that it should consider whether Father showed that the proposed relocation is not in B.B.'s best interests. The trial court considered this portion of the analysis as part of its general consideration of B.B.'s best interests. We will follow suit and consider it below.

easy and inexpensive. Mother delivered [B.B.] to Father's house on her way to work and picked him up after work.

b. Mother proposes that she be allowed to relocate with [B.B.] to North Judson on a permanent basis and that she be awarded primary physical custody of [B.B.]

    i. In this scenario, Mother also proposes that maternal grandfather . . . be the individual who gets [B.B.] off to school and who is there to receive [B.B.] at the end of the school day. Grandfather would also provide the after school care . . . until Mother returns home from work at approximately 5:15 p.m.

    ii. Mother believes that if Father wants to exercise parenting time with [B.B.] every day, he can drive to North Judson each day to do so. This would involve Father driving 45 minutes (in good weather) each way to spend the same or similar time with [B.B.] after school. It would be impractical for Father to have the time he currently has with [B.B.] before school.

    iii. The cost and hardship to Father would increase drastically if Father had to drive to North Judson and back every day . . . .

c. Awarding Father primary physical custody of [B.B.] would allow him to preserve the same level of parenting time to which both he and [B.B.] have become accustomed. Additionally, since Mother works in Porter County within minutes of Father's residence, the burden upon her to exercise her parenting time with [B.B.] before and after school (before work and after work for Mother) is

much less disruptive to all involved than Mother's scenario.

Appealed Order p. 6-7. The evidence in the record supports these findings.

[8] Third, the trial court considered the feasibility of preserving the relationship between Father and B.B. if relocation occurred. The trial court found as follows:

a. . . . Both parties have the financial resources to exercise parenting time with [B.B.] regardless of which parent is awarded custody.

b. However, the feasibility of preserving the relationship between Father and [B.B.] through suitable parenting time has already become alarmingly problematic . . . and it concerns the Court that it will continue to cause issues if Mother is permanently allowed to relocate with [B.B.] 45 minutes away from Father.

c. Mother has made it clear that she wants Grandfather to be the constant in [B.B.'s] life. She wants him to serve in a much larger role than Father by acting as the daycare provider before and after school each day.

d. Since Mother decided that she needed to relocate to North Judson, Grandfather has repeatedly accused Father of not parenting [B.B.] adequately. Grandfather's behavior does not engender a sense of "preserving the relationship between Father and [B.B.]" . . . Mother has done little to quell Grandfather's behavior.

  e.  Finally, Mother's own stream of accusations—including the false allegations of sexual misconduct she made against Father—demonstrated the lengths she would go to cut Father out of [B.B.'s] life.

*Id.* at 7-8. The evidence in the record supports these findings.

[9] Fourth, the trial court considered whether there is an established pattern of conduct by Mother to thwart Father's contact with B.B. The trial court found as follows:

  a.  In December of 2014, Grandfather, the individual whom Mother wanted as the "constant" in [B.B.'s] life, began hurling accusations at Father about his parenting of [B.B.]

    i.  Grandfather alleged Father was not feeding [B.B.] properly.

    ii.  He alleged Father did not clothe [B.B.] adequately which caused [B.B.] to get sick.

    iii.  Grandfather claimed that only Grandfather could take proper care of [B.B.]

    iv.  When Father stopped forfeiting his own parenting time to allow Grandfather to have time with [B.B.], Grandfather stated, ". . . one way or another, I'm going to see my grandchild."

  b.  One week after Grandfather made that statement, Mother contacted DCS alleging:

i.      Father was not making [B.B.] use the car seat.

ii.     Father was allowing [B.B.] to drive on I-9.

iii.    Father's dog was aggressive and biting [B.B.]

iv.     Father made Play-Doh feces and photographed it coming out of [B.B.'s] pants and posted it on Facebook.

v.      Father painted profanity on the walls of his home.

c.   After DCS investigated Mother's allegations and found them unsubstantiated, Mother failed to allow Father to resume his parenting time with [B.B.]  Mother claimed the DCS hotline staff member told her not to allow Father to have parenting time . . . ; however, the DCS caseworker . . . indicated that when a case is unsubstantiated, they encourage parents to abide by any custody/parenting time orders that are in place.  The caseworker stated that Mother was upset the allegations against Father were unsubstantiated.  The caseworker also testified that Mother hung up on her.

d.   . . . Mother [also reported] her allegations against Father to [law enforcement].  Mother claimed [a lieutenant] told her not to let Father have [B.B.] for parenting time.

e.   Mother claimed someone at the prosecutor's office told her not to allow Father to have parenting time with [B.B.]

f.   Despite DCS finding the matter unsubstantiated and the police investigation being concluded (without any action

toward Father), Mother continued to deny Father's parenting time.

g.     Even after this Court ordered her to resume Father's parenting time, Mother refused to do so. Father had to seek the assistance of law enforcement to enforce the Court's parenting time order.

\*\*\*

j.     Since Mother wanted to have primary physical custody of [B.B.] and have Grandfather serve as the "constant" in [B.B.'s] life, Mother has also accused Father of [five separate instances of neglect].

k.     Mother has shown herself to be inflexible in compromising with Father or in attempting to resolve her concerns with Father.

\*\*\*

m.     . . . [Two law enforcement officers and a DCS caseworker] expressed their frustration to the GAL about the manner in which Mother was handling the situation—not allowing Father parenting time despite the investigations being concluded.

n.     On the other hand, from the time the parties divorced until Mother and Grandfather began accusing Father of neglect, Father shared his parenting time with Grandfather to keep the relationship between [B.B.] and Grandfather intact. . . . This demonstrates to the Court Father's willingness to include not only Mother but her family in [B.B.'s] life.

o.      Father has also been willing to forego his parenting time with [B.B.] at Mother's request if Mother wanted to have [B.B.] for a special occasion.

*Id.* at 8-11.  The evidence in the record supports these findings.

[10]    Fifth, the trial court considered Mother's reasons for relocating and Father's reasons for opposing the relocation.  Mother wanted to relocate because her "lease had expired on her residence, her roommate had moved away, and the rent was going to increase to an extent that Mother could not afford." *Id.* at 11. Father opposed the relocation for the following "well-founded" reasons:

a.      Father spent the majority of [B.B.'s] waking hours with him.  Since [B.B.] was an infant, Father fed him and cared for him.

***

c.      Father does not believe it is best for [B.B.] to suddenly have grandfather take over Father's role as a caretaker on a day-to-day basis.

d.      It seems illogical to enroll [B.B.] in a school in North Judson that is 45 minutes away from Mother['s place of employment] and Father when Father lives approximately 10 minutes from the . . . [s]chool [B.B.] would attend [if he remained with Father] and Mother works nearby.

e.      Father is available to provide all the care [B.B.] needs before and after school.  Because Father is self-employed and has very flexible hours, Father is available to care for

> [B.B.] every day. The parties do not need Grandfather to serve in that capacity.

*Id.* at 12. The evidence in the record supports these findings.

[11] Finally, the trial court considered the best interests of B.B. The trial court found that Father met his burden of showing that a permanent relocation of B.B. to live with Mother is not in B.B.'s best interests and that awarding physical custody of B.B. to Father is in the child's best interests. These conclusions are based on the following findings:

> a. Father works out of his home. . . . Father has plenty of time to get his work done, especially with [B.B.] in school. But even if [B.B.] was ill, Father has the ability to adjust his . . .work schedule to accommodate [B.B.]
>
> b. Father lives in a 3,000 square foot home with three bedrooms, and two bathrooms. . . . Father lives within ten minutes of most of his relatives. . . .
>
> c. . . . Since [B.B.] began attending school [in father's school district], [B.B.] has shown steady improvement in his performance from first to second semester. Father has been very active with [B.B.'s] education and has shown consistency with communicating with [B.B.'s] teachers when necessary.
>
> ***
>
> e. Father fully cooperated with DCS, the Porter County Sheriff's Department and the GAL during the course of their investigations into the allegations Mother raised

against Father.  Father contacted the DCS caseworker within 15 minutes of learning there was a complaint made. . . .

f.  Mother, on the other hand, initially denied knowing about the DCS complaint when Father first contacted her about it.  When Mother talked to the caseworker on the phone, Mother said the caseworker hung up on her.  When Mother referred to the [law enforcement] investigation, Mother found the department "very unhelpful" the first time around.  When Mother talked to Father about the GAL, she said, "Can't we just get rid of her?  F—k her." . . . The GAL had little to no contact with Mother for the six months preceding the hearing. . . .  Mother took issue or had problems with everyone involved.

g.  Mother's credibility is extremely suspect as well.  First, she admitted that she knew Father had not engaged in sexual misconduct toward [B.B.] but filed the paperwork anyway . . . .  She signed it under oath despite knowing it was false.  Second, Mother testified that once she received the final call that everything had been dropped with the police and everything else, Father could pick up [B.B.] that Friday and resume his normal parenting time.  In reality, Father had to have the additional assistance of the police to ultimately resume his regular parenting time due to Mother's refusal to comply.

h.  Despite Father being cleared of as many neglect allegations as Mother and Grandfather could muster, Mother still testified that [B.B.] would be safer with Mother and Grandfather than Father.  Coincidentally, when the GAL conducted her investigation [in which she interviewed at least fourteen people], the only people who had concerns about Father's parenting skills were Mother and maternal grandparents.  It is not in [B.B.'s] best

> interest to live in a household with a parent who thinks that she is more entitled to have custody or better able to parent [B.B.] because she is the mother. . . . The attitudes exhibited by Mother and Grandfather create an environment that not only minimizes Father's importance and role in [B.B.'s] life but also makes it necessary for Father to continuously defend against Mother's and Grandfather's newest accusation.

*Id.* at 18-20. The evidence in the record supports these findings.

[12] It is readily apparent in reading the trial court's order that it complied with both the letter and spirit of our instructions in the first appeal. It considered all required statutory factors and applied the burden-shifting analysis, going into thorough detail along the way. We find that the evidence in the record supports all the trial court's findings of fact and that those findings, in turn, support the trial court's decision to award physical custody of B.B. to Father and to deny Mother's motion to relocate with the child. Mother's arguments to the contrary amount to requests that we reweigh the evidence and second-guess the trial court's assessment of the parties and witnesses—requests we decline.

[13] At the end of the Appellee's Brief, Father requested the imposition of sanctions, including appellate attorney fees, because of "Mother's frivolous and vexatious appeal . . . ." Appellee's Br. p. 20. We are tempted to grant this request given Mother's provably false contention that the trial court failed to comply with this Court's instructions. We are mindful, however, of the significant effect on Mother of the trial court's order, which divested her of custody of her child, and understand that as a parent, she is taking all actions within her power to regain

that custody. Given that reality, we decline to order attorney fees or other sanctions based on this appeal.

[14] The judgment of the trial court is affirmed.

Bailey, J., and Altice, J., concur.